## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

CHANDIA HARRIS,

    Plaintiff,

          v.

GEORGIA DEPARTMENT OF JUVENILE
JUSTICE,

    Defendant.

Civil Action No.
1:23-cv-05180-SDG

### OPINION AND ORDER

Plaintiff Chandia Harris was a Juvenile Correctional Lieutenant employed by Defendant Georgia Department of Juvenile Justice (DJJ) at the Macon Youth Development Center. She alleges she was subjected to illegal discrimination and retaliation because she is openly gay.[1] She brings claims for discrimination and retaliation in violation of Title VII.[2] The matter is now before the Court for consideration of the final report and recommendation (R&R) of United States Magistrate Judge Regina D. Cannon [ECF 38], which recommends that DJJ's motion for summary judgment be granted. Harris objected,[3] and DJJ responded.[4] While the Court declines to adopt the R&R, it agrees with Judge Cannon's conclusion that DJJ is entitled to judgment in its favor.

---

[1]   ECF 1, ¶ 2.

[2]   *See generally* ECF 1.

[3]   ECF 40.

[4]   ECF 41.

I. **Scope of the Court's Review**

A party challenging a report and recommendation issued by a United States Magistrate Judge must file written objections that specifically identify the portions of the proposed findings and recommendations to which an objection is made and must assert a specific basis for the objection. *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009). The district court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *Jeffrey S. ex rel. Ernest S. v. State Bd. of Educ. of Ga.*, 896 F.2d 507, 512 (11th Cir. 1990). The district court has broad discretion in reviewing a magistrate judge's report and recommendation. *Williams v. McNeil*, 557 F.3d 1287, 1290–92 (11th Cir. 2009).

A. **Harris's Failure to Comply with LR 56.1**

The R&R concluded that Harris's response to the motion for summary judgment did not comply with the Federal Rules of Civil Procedure or the Court's Local Rules.[5] Harris responded to DJJ's statement of material facts by repeating the fact and then including a response below that fact that cites to the record when the fact is in dispute.[6] While the response paragraphs do not have their own individual numbering, they are directly below DJJ's numbered paragraphs. That

---

[5]    ECF 38, at 2–4.

[6]    *See generally* ECF 31-1.

2

approach is not necessarily problematic. But Harris did not provide her own statement of additional facts that conforms to the requirements of the Local Rules. LR 56.1(B)(2)(b), NDGa. She instead included an unnumbered statement of facts in her response brief with record citations.[7]

When a party does not comply with the Court's Local Rules concerning statements of material fact for summary judgment briefing, "[t]he proper course . . . is for a district court to disregard or ignore evidence relied on by the respondent—but not cited in its response to the movant's statement of undisputed facts—that yields facts contrary to those listed in the movant's statement. That is, because the non-moving party has failed to comply with Local Rule 56.1." *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008). However, the R&R did not disregard Harris's contrary facts. Instead, to the extent Harris presented "facts that are material, supported by the record, and disputed," the R&R considered them and construed them in the light most favorable to Harris.[8]

Whatever the benefits of that approach, the Eleventh Circuit has made clear that a district court cannot follow it when a party fails to comply with LR 56.1. "[I]f the district court does not 'hew to the evidentiary line drawn by Local Rule 56.1,' and considers the evidence submitted by the noncompliant party, it cannot pick

---

7    ECF 31-2, at 1–5.

8    ECF 38, at 4.

and choose and instead must 'base its decision on *all* of the evidentiary materials in the record on summary judgment.'" *Connell v. Golden Corral Corp.*, No. 23-11472, 2024 WL 2943999, at *2 (11th Cir. June 11, 2024) (per curiam) (emphasis in original) (quoting *Reese*, 27 F.3d at 1270).

### B.    Title VII Claims at Summary Judgment

Given the R&R's approach to assessing the material facts in dispute, the Court cannot readily determine if the R&R relied on facts it should not have. Since those facts necessarily affect the legal analysis, the Court cannot be certain that the R&R's conclusions were not informed by improper consideration of the facts.

In addition, the R&R only analyzes Harris's claims under the *McDonnell-Douglas* rubric[9]—likely because that is the only basis on which DJJ sought judgment.[10] Under *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff must first make out a prima facie case of discrimination. The employer must then rebut the presumption of intentional discrimination triggered by that prima facie case. Finally, the plaintiff must show that the adverse employment action was the result of intentional discrimination. *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023). But this is an evidentiary framework, not "a stand-in for the ultimate question of liability in Title VII discrimination cases." *Id.* at 941.

---

[9]    *Id.* at 10–24.

[10]    ECF 30-1, at 5–20.

*McDonnell Douglas* does not supply "a set of elements that the employee must prove—either to survive summary judgment or prevail at trial." *Id.* A plaintiff could, for instance, prove her case by presenting a "convincing mosaic" of circumstantial evidence from which a jury could infer intentional discrimination. *Id.* at 946. Because the R&R focused on Harris's purported failure to satisfy *McDonnell Douglas*, it did not consider whether there was sufficient evidence that Harris was terminated because of her sexual orientation.

The Court must therefore decline to adopt the R&R. Instead, it has conducted a *de novo* review of the record and rules directly on DJJ's motion for summary judgment based on those evidentiary materials. That said, the parties mostly rely on the same evidence in support of their respective positions. And the Court reaches the same conclusion that Judge Cannon did—that DJJ is entitled to summary judgment.

## II. Factual Background[11]

### A. DJJ and the Center

DJJ is a state agency that provides rehabilitative treatment services and supervision to minors.[12] The Macon Youth Development Center (the Center) is one

---

[11] The Court views these facts in the light most favorable to Harris. *Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1172–73 (11th Cir. 2024).

[12] ECF 30-7, ¶ 3; ECF 31-1, ¶ 2.

of DJJ's facilities; its residents must be supervised at all times because DJJ is responsible for them.[13] All posts need to be covered for each shift, and someone has to be available to respond to any incidents.[14] As a result, an officer on duty is not supposed to leave her shift until another officer has arrived to relieve her.[15] It is a job requirement for every employee who "holds post" (that is, someone who supervises the residents) to be able to work any day and shift.[16] There should never be a time when a post is vacant because of staffing issues or shortages.[17] Lieutenants, in particular, are in leadership roles and need to set an example.[18]

Harris was re-hired on April 1, 2021 to work at the Center.[19] She had worked for DJJ from June 2006 through March 2014.[20] She was aware of DJJ's policy that all shifts and all posts must be staffed.[21] Cynthia Dupree was the Center's Facility

---

[13]    ECF 30-7, ¶ 9.

[14]    ECF 30-6, ¶ 8; *see generally* ECF 26 (Dupree Tr. at 32:22–34:3).

[15]    ECF 26 (Dupree Tr. at 39:17–21); ECF 30-5, ¶ 3.

[16]    ECF 26 (Dupree Tr. at 53:16–54:3, 62:21–23); ECF 30-7, ¶ 9.

[17]    ECF 28 (Dalesio Tr. 14:9–11).

[18]    ECF 30-7, ¶ 9.

[19]    ECF 30-9, at 4; ECF 31-6.

[20]    ECF 24 (Harris Tr. at 18:4–10).

[21]    *Id.* (Harris Tr. at 45:13–20).

Director and Harris's indirect supervisor.[22] Demarcus Holloway was a lieutenant when Harris was hired.[23] He was promoted to Captain several months later, becoming Harris's direct supervisor.[24] Holloway indirectly reported to Dupree.[25]

### B.    Early Problems

#### 1.    April 2021

On April 6, 2021, Harris filed a complaint with human resources (HR).[26] She reported that she had overheard a conversation between Margarette Johnson and Denise Shinholster that took place in Dupree's office during which the women expressed negative opinions about gay people.[27] The HR complaint does not state that Dupree was present,[28] but much later, Harris asserted that Dupree *was* there and had stated that gay people were going to hell.[29]

---

[22]   ECF 30-4, ¶ 1 n.1, ¶ 2. Cynthia Dupree is the name by which she was known for at least a portion of the relevant time. She is now known as Cynthia Dudley. *Id.* ¶ 1, 1 n.1. For consistency, this Order refers to her as "Dupree."

[23]   ECF 30-5, ¶ 2.

[24]   *Id.* (indicating that Holloway was promoted on October 16, 2021).

[25]   ECF 26 (Dupree Tr. at 8:20–25, 9:10–23).

[26]   ECF 30-9, at 5–6; ECF 31-7.

[27]   Johnson was the Assistant Director of Security at the Center; Shinholster was the administrative office manager. ECF 26 (Dupree Tr. at 14:23–25, 15:19–22). Johnson was a superior officer to Harris and reported directly to Dupree. *Id.* (Dupree Tr. 8:20–25, 9:10–12).

[28]   ECF 30-9, at 5–6; ECF 31-7.

[29]   ECF 24 (Harris Tr. at 39:14–20).

Harris was troubled by the conversation to the point that she had difficulty continuing her work that day.[30] Harris spoke with Benita Ferguson from HR on April 7. Harris withdrew her complaint and stated that she would talk to the women directly instead.[31] Ferguson told Dupree about her conversation with Harris and Harris's withdrawal of the complaint.[32]

After filing this complaint, Harris believed she was "nitpick[ed]" by Dupree,[33] with the latter always making Harris change the post assignments she had prepared.[34] But the changes related primarily to one staff member whom Harris supervised who had a history of "calling in."[35] Harris believes Dupree was concerned about that other staff member's conduct, not Harris's.[36] Harris also felt that Dupree's interactions with the other lieutenants were more friendly. As a result, Harris believes she was treated differently from all the other supervisors.[37] Harris attributed Dupree's cold behavior toward her to the HR complaint. Before

---

[30] ECF 30-9, at 5–6; ECF 31-7.

[31] ECF 30-9, at 7; ECF 31-8; ECF 31-11, at 1.

[32] ECF 30-9, at 7; ECF 31-8.

[33] ECF 24 (Harris Tr. at 31:6–7, 68:23–68:6). *See generally id.* (Harris Tr. at 31:2–33:10).

[34] *Id.* (Harris Tr. at 31:17–33:8).

[35] *Id.* (Harris Tr. at 33:17–25).

[36] *Id.* (Harris Tr. at 35:4–8).

[37] *Id.* (Harris Tr. at 72:25–73:11, 73:25–74:2).

that, Dupree seemed more friendly.[38] Harris could not identify any other way in which Dupree singled her out.[39]

Nearly a year after making the April 2021 complaint—in a March 2022 HR complaint about an entirely separate issue—Harris alleged that Dupree was involved in the April 2021 conversation with Johnson, with no mention of Shinholster.[40]

### 2. July 2021

The record contains a written reprimand dated July 27, 2021, by LaKecia James to Harris.[41] The document was not signed by either woman,[42] and Harris denies having received it.[43] The reprimand addressed Harris's July 19 refusal to assume post and insubordinate behavior.[44] Harris refused to follow the directives of the Assistant Director of Security (Johnson) and the Director (Dupree), and left

---

[38]  *Id.* (Harris Tr. at 73:12–74:2).

[39]  *Id.* (Harris Tr. at 33:3–11, 34:25–35:3).

[40]  ECF 31-11, at 1. *See infra* Section II.C.1.

[41]  ECF 30-9, at 57–58; ECF 31-9. James was the Captain at the Center when Harris was hired. ECF 31-6.

[42]  ECF 26 (Dupree Tr. at 28: 1–14); ECF 30-9, at 57–58; ECF 31-9. A September 9, 2022 email from the DJJ's Assistant Deputy Commissioner indicates that there was only one fully executed reprimand in Harris's file. ECF 31-17.

[43]  ECF 24 (Harris Tr. at 121:21–25).

[44]  ECF 30-9, at 57; ECF 31-9, at 1.

the Center without approval.[45] The reprimand warned that further instances of such conduct would be met with disciplinary action, including possible dismissal.[46]

### 3. September 2021

On September 20, 2021, Johnson wrote to Kimberly Smith (the Regional Administrator for DJJ and Dupree's supervisor[47]) describing concerns about Harris.[48] It addressed the July 19 incident.[49] When Dupree spoke with Harris about her conduct that day, Harris was rude and disrespectful.[50] Johnson also spoke with Harris, who was upset about taking post.[51] Harris did not go to work as scheduled five times in the ten days following the incident.[52] Harris was also given leave

---

[45]   ECF 30-9, at 57; ECF 31-9, at 1.

[46]   ECF 30-9, at 57; ECF 31-9, at 1.

[47]   ECF 28 (Dalesio Tr. 7:16–18); ECF 30-7, ¶ 2.

[48]   ECF 30-9, at 56; ECF 31-10. For purposes of this Order, the Court presumes that these hearsay statements could be reduced to admissible form. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (quoting *Macuba v. Deboer,* 193 F.3d 1316, 1323 (11th Cir. 1999)) ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.").

[49]   ECF 30-9, at 56; ECF 31-10.

[50]   ECF 30-9, at 56; ECF 31-10.

[51]   ECF 30-9, at 56; ECF 31-10.

[52]   ECF 30-9, at 56; ECF 31-10.

without pay for August 2, when she failed to report for duty as scheduled.[53]

Between August 31 and September 19, Harris was absent nine times, though three

of those days were bereavement leave.[54] Smith and Johnson spoke with Harris

about her attendance; Harris indicated that she understood how important it was

for her to be present when scheduled for duty.[55]

### C.    Escalation of the Issues

#### 1.    March 2022

Holloway (now the Captain and Harris's direct supervisor) issued Harris a

written reprimand related to a March 8, 2022 incident.[56] According to the

reprimand, Harris reported to work but became insubordinate and repeatedly

refused to assume post as directed.[57] She wanted to leave before her relief had

arrived.[58] She then bypassed the chain of command by reporting the incident to

HR and asking to speak with the Assistant Deputy Commissioner rather than

discussing the issue with Dupree.[59] When Dupree did speak with Harris, Harris

---

[53]   ECF 30-9, at 56; ECF 31-10.

[54]   ECF 30-9, at 56; ECF 31-10.

[55]   ECF 24 (Harris Tr. at 143:11–144:4); ECF 30-9, at 56; ECF 31-10.

[56]   ECF 30-5, ¶ 4; ECF 30-9, at 54–55; ECF 31-12. Holloway's reprimand is dated March 30, 2022.

[57]   ECF 30-9, at 54; ECF 31-12, at 1.

[58]   ECF 30-5, ¶ 4.

[59]   *Id.*; ECF 30-9, at 54; ECF 31-12, at 1.

refused Dupree's directives and left work because her blood pressure was high.[60] The reprimand emphasized that Harris's "actions/behavior directed toward [her] supervisors while on duty is a discredit to the department and will not be tolerated."[61] It further warned that additional instances of such conduct by Harris would be met with disciplinary action—including possible dismissal.[62] Harris signed the reprimand.[63]

According to Harris, the incident arose because the person who was supposed to relieve her failed to do so; she feels that someone should have relieved her sooner.[64] Harris also contends that Dupree authorized her leaving because her blood pressure was high.[65] As a result, Harris believes the reprimand should have been voided.[66] She reported the reprimand to Smith and filed an HR complaint the day after the incident.[67]

---

[60]   ECF 30-5, ¶ 4; ECF 30-9, at 54; ECF 31-12, at 1.

[61]   ECF 30-9, at 54; ECF 31-12, at 1.

[62]   ECF 30-9, at 55; ECF 31-12, at 2.

[63]   ECF 30-9, at 55; ECF 31-12, at 2.

[64]   ECF 24 (Harris Tr. at 42:23–43:24).

[65]   *Id.* (Harris Tr. at 45:6–12).

[66]   *Id.* (Harris Tr. at 122:2–14, 123:3–5).

[67]   *Id.* (Harris Tr. at 44:3–6).

Harris's HR complaint named both Holloway and Dupree.[68] Harris alleged that Holloway had threatened her job after she made him aware that she had been relieved from her post late.[69] However, Harris testified that Holloway's conduct was not related to her sexual orientation.[70] As for Dupree, the HR complaint stated that Harris felt like she was being targeted by Dupree because of her sexuality.[71] It also asserted for the first time that Dupree had been involved in the April 2021 "gay bashing" conversation.[72] Dupree denied involvement in the discussion or having made any inappropriate comments about same sex relationships.[73] The complaint was investigated and HR concluded that there was no evidence of a hostile work environment or retaliation, or that Dupree "has a gender bias."[74]

### 2.    Harris's August 3, 2022 HR Complaint

On August 3, 2022, Harris emailed a complaint to Smith (among others), reporting the following. A resident of the Center told Harris that she (the resident) overheard a conversation on August 2 between Lieutenant Carlissa Burnett and

---

[68]    ECF 31-11.

[69]    *Id.* at 1.

[70]    ECF 24 (Harris Tr. at 54:1–5).

[71]    ECF 31-11, at 1.

[72]    *Id.* at 1.

[73]    ECF 26 (Dupree Tr. at 14:9–18); ECF 30-6, ¶ 6.

[74]    ECF 30-9, at 8.

Officer Shawn Williams. They were discussing Harris and coverage for her shifts. Burnett reportedly stated that Harris wanted other people to do her job for her. When the resident interrupted the conversation, Officer Williams referred to Harris as a "dyke ass."[75] Harris completed an incident report about the event, as did the resident.[76] Burnett completed an incident report denying that Williams made the statement.[77] Williams's incident report does not outright deny that he made the statement but commented that he had better "things to do than to sit and talk about" Harris.[78] Holloway spoke with both Harris and Burnette about the incident, and informed Smith.[79] Harris does not think Burnett was biased against gay people but that Burnett should have addressed Williams's comment.[80]

### 3.    Harris's August 26–28 Leave

In July or early August 2022, Holloway approved Harris for leave for August 26 to 28, 2022, for her wedding and honeymoon.[81] Dupree was on

---

[75]    ECF 30-9, at 9.

[76]    *Id.* at 10–12.

[77]    *Id.* at 13.

[78]    *Id.* at 14.

[79]    *Id.* at 16.

[80]    ECF 24 (Harris Tr. at 62:5–12).

[81]    ECF 26-5 (stating leave was approved on July 15, 2022); ECF 26-8 (indicating leave was approved on August 3); ECF 31-15 (stating leave was approved in July); *see also* ECF 30-4, ¶ 8. The exact date is immaterial. There is no dispute

bereavement leave at that point.[82] Holloway left his position at the Center on August 11, after Dupree returned from leave.[83] Upon Dupree's return, the Center was very short-staffed because Holloway (who was the Captain) and the Assistant Director had left their jobs and one of the four lieutenants was on medical leave.[84]

On August 23, Dupree cancelled Harris's leave for August 28, but eventually left the entire leave period intact and instead scheduled Harris to cover a different shift.[85] In contrast, Harris claims that Dupree never rescinded the cancelation of her August 28 leave; Harris just did not report to work that day.[86] Time records indicate that Harris's August 28 leave day was authorized.[87] Harris did not understand why her leave was being canceled when two other officers (junior to her) had leave approved for that day.[88]

---

that Holloway approved the leave, and that Dupree was unaware of it until she returned to the office.

[82]  ECF 24 (Harris Tr. at 79:7–11); ECF 26 (Dupree Tr. at 46:22–47:16).

[83]  ECF 30-5, ¶ 2.

[84]  ECF 30-4, ¶ 6.

[85]  ECF 26 (Dupree Tr. at 61:2–10, 69:20–70:2); ECF 26-8 (reflecting denial of leave for August 28 due to staff shortage); ECF 30-7, ¶ 6.

[86]  ECF 24 (Harris Tr. at 83:5–13).

[87]  *Id.*; ECF 24-10, at 9.

[88]  *Id.* (Harris Tr. at 81:8–18).

### 4.    The Weekend Assignment (September 2–4)

#### i.    August 25

On August 25, 2022, Dupree informed Center staff about coverage for the next two weekends. Because of staff shortages, Harris was directed not to work on Wednesday, August 31, and Thursday, September 1 (her regularly scheduled days), but to work the night shift the weekend of September 2 through 4.[89] Had she not been scheduled for the September 2–4 shift, Harris would have had three weekends off in a row. She usually worked every other weekend.[90] Dupree later explained that the lieutenants need to divide up the schedule.[91]

Harris responded to Dupree's directive by saying that she could not work the night shift because of childcare issues. She objected to having her shifts changed.[92] Dupree replied that no person had a permanent shift and that, as a lieutenant, Harris was subject to work any shift based on the Center's needs.[93]

---

[89]  ECF 30-11, at 5; ECF 31-14. *See also* ECF 31-15.

[90]  ECF 24 (Harris Tr. at 86:3–14, 93:6–22, 116:10–25). Lieutenant Burnett had covered the days Harris was on leave for her honeymoon as well as the next two weekdays (*i.e.*, August 26–30). Burnett declined to work the September 2–4 shift to which Harris had been assigned. ECF 30-4, ¶ 8.

[91]  ECF 30-4, ¶ 8.

[92]  ECF 30-11, at 5.

[93]  *Id.* at 4.

Harris accused Dupree of engaging in retaliatory behavior because Holloway had approved Harris's August 26–28 leave, but did not state that the retaliation had anything to do with her sexual orientation.[94] During her deposition, however, Harris claimed that Dupree was retaliating because of sexual orientation since no other employee had to put in leave time for a weekend that they were scheduled to be off.[95] Harris forwarded her email exchange with Dupree to, and had a discussion with, Regional Administrator Smith.[96]

### *ii.* **August 29**

After she returned from her honeymoon, on August 29, Harris sent a complaint to Martha Dalesio, Assistant Deputy Commissioner of DJJ.[97] Harris asserted that Dupree was retaliating against her because of the leave that Holloway had approved and that Dupree was "always targeting" her.[98] Harris emphasized that she could not work night shifts because she had no one to take

---

[94]  ECF 30-11, at 4; ECF 31-15, at 1.

[95]  ECF 24 (Harris Tr. at 93:23–94:12).

[96]  ECF 24-11; ECF 30-11, at 4.

[97]  ECF 28 (Dalesio Tr. at 6:9–10); ECF 31-15. Dalesio was Smith's direct supervisor and oversaw a division of 25 facilities, including the Center. ECF 28 (Dalesio Tr. at 6:21–25, 7:12–15).

[98]  ECF 31-15, at 1.

care of her two special-needs children.[99] The complaint did not assert that Dupree was targeting Harris because of her sexual orientation.[100]

### iii.    August 31

Harris then reported to work on one of her regularly scheduled days (August 31), even though Dupree had instructed her not to report that day.[101] The two women had a confrontation with Dupree about why Harris was at work when she had been instructed to work September 2–4 instead. According to Dupree, Harris became aggressive and Dupree instructed her to leave. Harris refused.[102] Harris testified that Dupree was the one yelling.[103] Harris later called Dalesio to report the incident.[104] Dupree called Smith.[105]

### iv.    The "Town Hall"

Allyson Richardson was the Deputy Commissioner for the Division of Administrative Services for DJJ, and was responsible for overseeing human resources functions.[106] She was called to the Center to mediate the conflict between

---

[99]  *Id.* at 1.

[100]  *See generally* ECF 31-15.

[101]  ECF 24 (Harris Tr. at 89:11–17); ECF 30-7, ¶ 7; ECF 30-11, at 5.

[102]  ECF 26 (Dupree Tr. at 73:8–74:20); *see generally id.* (Dupree Tr. at 73:8–75:20).

[103]  ECF 24 (Harris Tr. at 103:5–23, 104:6–18).

[104]  *Id.* (Harris Tr. at 103:24–104:5).

[105]  ECF 26 (Dupree Tr. at 76:2–6); ECF 30-7, ¶ 7.

[106]  ECF 30-6, ¶ 2.

Harris and Dupree.[107] Smith and Dalesio were also at this "town hall."[108] Dupree was not.[109] Smith and Richardson made sure that Harris understood she was required to work any shift, at any time, and that she needed to be flexible.[110] Harris indicated she understood that, if she was on the schedule, she had to work.[111] Richardson, Smith, and Dalesio discussed with Harris her insubordinate and "reportedly aggressive" behavior.[112] Harris agreed to work the weekend shift to which she had been assigned.[113] Harris does not believe that anyone in the town hall was discriminating against her for her sexual orientation.[114]

According to Harris, Richardson told her to come to work the following day (September 1), which she did.[115] Harris believed everything was fine at that point.[116] In contrast, Richardson described Harris as irate and disrespectful during

---

[107] ECF 30-6, ¶ 3. The exact date of the mediation is not clear from the record but it was before the September 2–4 weekend shift Harris had been assigned to work. *Compare* ECF 24-11, *with* ECF 30-7, ¶¶ 6–9.

[108] ECF 30-7, ¶ 8; ECF 28 (Dalesio Tr. 19:7–15).

[109] ECF 24 (Harris Tr. at 105:14–21).

[110] ECF 30-6, ¶ 5; ECF 30-7, ¶ 9.

[111] ECF 30-6, ¶ 5. *See also* ECF 30-7, ¶ 9.

[112] ECF 28 (Dalesio Tr. 19:18–22).

[113] ECF 30-7, ¶ 9.

[114] ECF 24 (Harris Tr. at 110:12–19).

[115] *Id.* (Harris Tr. at 106:7–19).

[116] *Id.* (Harris Tr. at 106:21–107:8).

the town hall. Smith described her as very upset.[117] Richardson attested that Harris

could have been terminated on the spot because of her behavior.[118]

Despite her agreement to do so, Harris did not report to work on September

2–4 as scheduled.[119]

### D.    Termination

Harris was dismissed from her position on September 9, 2022. According to

the termination letter, her dismissal was based on her refusal to work her

scheduled shift and insubordinate behavior when told to leave the facility, as well

as her prior disciplinary history.[120] Dupree signed the termination letter.[121]

DJJ has a progressive discipline policy, but its details are not reflected in the

record.[122] Smith described the decision to terminate Harris's employment as a

"group" one.[123] Smith heard about issues related to Harris's conduct "[e]very

week."[124] Dupree was part of the discussions, and can recommend terminations

---

[117] ECF 30-7, ¶ 6.

[118] ECF 30-6, ¶ 11.

[119] ECF 24-10, at 33–34; ECF 30-6, ¶ 6; ECF 30-7, ¶ 9.

[120] ECF 30-9, at 59; ECF 31-16, at 1. *See also* ECF 26 (Dupree Tr. at 67:5–10); ECF 30-7, ¶ 9.

[121] ECF 30-9, at 59; ECF 31-16.

[122] ECF 26 (Dupree Tr. at 35:16–18); ECF 28 (Dalesio Tr. 23:5–56).

[123] ECF 30-7, ¶ 9.

[124] *Id.* ¶ 5.

but cannot approve them.[125] Richardson was involved in the termination decision,[126] as were Dalesio and HR at the central office.[127] Richardson agreed that Harris should be terminated because she did not come to work as scheduled from September 2 to 4 and she had already had several instances of not coming to work.[128] Either the Commissioner or Deputy Commissioner of DJJ advised that Harris be terminated.[129] HR and DJJ leadership made the decision based on Harris's conduct.[130]

In contrast, an unsent email from Dalesio dated the same day as Harris's termination letter states that "[t]here appear[ ] to be several migrating [sic] factors that leads to a different course of action" for Harris other than termination.[131] Dalesio's email indicated, among other things, that there was only one fully executed reprimand in Harris's file; and she had outstanding complaints about

---

[125] ECF 26 (Dupree Tr. at 36:3–13, 67:5–10); ECF 30-4, ¶ 9.

[126] ECF 30-4, ¶ 9.

[127] ECF 28 (Dalesio Tr. at 23:7–12).

[128] ECF 30-6, ¶ 6.

[129] ECF 26 (Dupree Tr. at 76:12–18).

[130] ECF 30-4, ¶ 9.

[131] ECF 28 (Dalesio Tr. at 28:20–29:9); ECF 31-17.

harassment and retaliation because of her sexual orientation.[132] The email reflected Dalesio's notes to herself and points of discussion about Harris's termination.[133]

### E.    General Employer Concerns

According to Dupree, the Center "struggled" with Harris "as far as scheduling shifts that she was willing and able to work, getting her to take her post, and her aggressive behavior."[134] Harris had problems taking direction from Dupree and Holloway.[135] She was "aggressive" and caused "a lot of stress and hostility."[136] Despite these problems, Dupree attests that she tried to work with Harris to be flexible with her schedule.[137] However, lieutenants are expected to do more than the lower-ranked officers because lieutenants have more authority and get paid more.[138]

Holloway described Harris as unreliable: She was frequently absent and rarely on time.[139] She would also leave early without asking permission.[140] When

---

[132]  ECF 31-17.

[133]  ECF 28 (Dalesio Tr. at 29:13–22).

[134]  ECF 30-4, ¶ 5.

[135]  *Id.*

[136]  *Id.* ¶ 10.

[137]  *Id.* ¶ 7.

[138]  *Id.*

[139]  ECF 30-5, ¶ 3.

[140]  *Id.*

Harris did ask to leave early, Holloway "always said yes" because he knew she would leave anyway.[141] As her supervisor, Holloway often had to cover Harris's shifts when she did not arrive on time or left early.[142] Harris denied that other people had to hold over on their shifts because she was tardy, but acknowledged that "there were a couple of mornings" where she ran late.[143] Holloway said Harris was "not easy to work with" and would refuse to take her post.[144] Other employees complained about Harris's attitude and behavior.[145]

## III. Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a); a fact is "material" if it could change the outcome of the case, and a dispute is "genuine" if a reasonable jury could resolve it in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The purpose of summary judgment is to test "the need for a trial"—to look for "factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250. Thus, "[t]he

---

[141]  *Id.*

[142]  *Id.*

[143]  ECF 24 (Harris Tr. at 52:24–53:10).

[144]  ECF 30-5, ¶¶ 5–6.

[145]  *Id.* ¶ 6.

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### A.    Harris's Discrimination Cause of Action

A plaintiff asserting discrimination under Title VII must show that she suffered an adverse employment action. *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (per curiam). Harris's termination qualifies as such. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "[T]he ultimate question in a discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes*, 88 F.4th at 941. That is, did Harris put forward enough evidence that a reasonable jury could conclude she was fired because of her sexual orientation? *See id.* at 942. Although it focuses on the *McDonnell-Douglas* framework in presenting its arguments, DJJ argues that Harris did not.[146] The Court agrees.

Harris attributes everything that happened to her while employed at the Center to her sexual orientation because of her April 2021 HR complaint.[147] There is evidence that those who made the decision to terminate Harris's employment were aware of her sexual orientation. But "discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.

---

[146]  ECF 30-1, at 5–12.

[147]  ECF 24 (Harris Tr. at 195:5–12).

When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (cleaned up). Richardson, Smith, and Dalesio were all decision-makers.[148] Harris, however, has pointed to no evidence suggesting that any of them concluded she should be terminated *because of* her sexual orientation. The evidence instead shows that the decision to end Harris's employment was made after her hostile interaction with Dupree and after she agreed to work the September 2–4 weekend shift and then failed to show up.[149]

The evidence about Dupree is different but she was not a decision-maker. Viewed in the light most favorable to Harris, Dupree may have harbored bias toward gay people, and "nitpicked" Harris and was less friendly to her as a result.[150] Dupree was involved in discussions about Harris's termination but did not have the authority to make the ultimate determination.[151] In fact, Dupree

---

[148]  ECF 28 (Dalesio Tr. at 23:7–12); ECF 30-4, ¶ 9; ECF 30-7, ¶ 9.

[149]  ECF 28 (Dalesio Tr. 19:7–15); ECF 30-6, ¶¶ 3, 5; ECF 30-7, ¶¶ 8–9.

[150]  ECF 24 (Harris Tr. at 31:2–33:10, 39:14–20, 68:23–68:6, 72:25–73:11, 73:25–74:2); ECF 31-11.

[151]  Although Harris raised a mixed-motive argument in her objections to the R&R, ECF 40, at 4–5, she made no such argument in response to the motion for summary judgment. *See generally* ECF 31. Accordingly, the Court declines to consider it now. *Williams*, 557 F.3d at 1291 (11th Cir. 2009) (holding that a district court does not abuse its discretion by declining to consider a party's argument that was not first presented to the magistrate judge).

testified that the termination decision was a joint one between HR and DJJ leadership.[152] Harris has not pointed to any evidence putting that fact in dispute.

Harris's comparator testimony about other employees who called out from work or were granted leave but not fired and other gay employees who were purportedly mistreated is entirely speculative. She presented no evidence that any of them—particularly anyone of her relatively high rank—had disciplinary histories of refusing to assume post, insubordination, and absenteeism.[153] She presented no details about how other gay employees were supposedly targeted.[154]

### B.    Harris's Retaliation Cause of Action

For her retaliation claim, Harris must show that she engaged in protected activity, suffered an adverse employment action, and that *but for* her protected activity she would not have suffered the adverse action. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135–36 (11th Cir. 2020) (en banc). As with Harris's discrimination claim, termination qualifies as an adverse employment action. *Burlington Indus.*, 524 U.S. at 761. DJJ argues that Harris cannot show its reasons

---

[152]  ECF 30-4, ¶ 9.

[153]  ECF 24 (Harris Tr. at  74:25–75:12, 96:24–99:20, 112:21–113:15, 118:10–24, 120:6–17, 158:1–22).

[154]  *Id.* (Harris Tr. at 35:15–36:5, 158:1–22).

for terminating her employment were pretextual.[155] Harris disagrees.[156] This argument goes to whether Harris's protected activity was the but-for cause of her termination: Would she have been fired if she hadn't filed multiple complaints with HR? *Gogel*, 967 F.3d at 1135 (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) ("To establish the necessary causation, a plaintiff must demonstrate that 'her protected activity was a but-for cause of the alleged adverse action by the employer.'").

Assuming without deciding that Harris's complaints to HR were protected activity, there is no evidence in the record connecting those complaints to the decision to terminate Harris's employment.

Harris points to the knowledge of the people involved in her termination of her numerous HR complaints and the positive feedback she received during the town hall as suggesting that the decision-makers were influenced by her protected activities. She also argues that the scrutiny and nitpicking she suffered indicate a retaliatory motive.[157] But these arguments avoid the crucial question of whether she would have been fired if she had never filed *any* HR complaints. Harris has failed to demonstrate a dispute of material fact on that point.

---

[155]  ECF 30-1, at 20.

[156]  ECF 31-2, at 17–21.

[157]  ECF 31-2, at 15–20.

The evidence shows that Harris would have been fired because of her history of problematic behavior—any protected activity notwithstanding. She received at least one written reprimand about her refusal to assume post and insubordinate behavior.[158] The reprimand warned that recurrence of this type of behavior would result in disciplinary action up to termination.[159] Harris was aware of the importance of all shifts and all posts being staffed.[160] Regional Administrator Smith was alerted to concerns about another instance of Harris refusing to take post and leaving the Center without authorization.[161] Harris was rude and disrespectful toward Dupree, and had numerous unscheduled absences from work.[162] She failed to report for duty as scheduled more than once.[163] There were frequent problems with Harris's willingness to work, to assume post, aggressive behavior, and absenteeism.[164]

When Harris was scheduled to work the September 2–4 night shift, she refused to do so.[165] She and Dupree had a "heated" conversation in which Dupree

---

[158] ECF 30-9, at 54–55.

[159] *Id.* at 55.

[160] ECF 26 (Dupree Tr. at 45:13–20).

[161] ECF 31-10.

[162] *Id.*

[163] *Id.*

[164] ECF 30-4, ¶¶ 5, 7, 10; ECF 30-5, ¶¶ 3, 5–7.

[165] ECF 30-11, at 4–5.

instructed Harris to leave.[166] Harris then had the "town hall" with Richardson, Smith, and Dalesio during which Harris expressed her understanding that she could be required to work any shift at any time.[167] She agreed to work as scheduled and then failed to report.[168] This final failure to report to work after agreeing to do so was more than enough misconduct to break any causal connection between Harris's termination and her protected activities. *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam) ("Intervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action.").

## IV. Conclusion

Having conducted a *de novo* review of the record, the Court declines to adopt the R&R [ECF 38] and denies the objections [ECF 40] as moot. The Court, however, agrees that Defendant Georgia Department of Juvenile Justice is entitled to summary judgment. Its motion [ECF 30] is therefore **GRANTED**.

---

[166]  ECF 24 (Harris Tr. at 103:5–104:18); ECF 26 (Dupree Tr. at 73:8–74:20); *see generally* ECF 26 (Dupree Tr. at 73:8–75:20).

[167]  ECF 30-6, ¶ 5. *See also* ECF 30-7, ¶ 9.

[168]  ECF 24-10, at 33–34; ECF 30-6, ¶ 6; ECF 30-7, ¶ 9.

The Clerk is **DIRECTED** to enter judgment in favor of Defendant and to close this case.

**SO ORDERED** this 31st day of March, 2025.

_____
Steven D. Grimberg
United States District Judge